UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| COMMONWEALTH OF MASSACHUSETTS, Plaintiff, v. AGRETECH, INC., Defendant. | Case No. **COMPLAINT** |
|---|---|

**INTRODUCTION**

1. Defendant Agretech, Inc. ("Agretech") operates a scrap recycling and waste recycling facility on at least 20 acres of land at 50 Jackson Street in Dracut, Massachusetts (the "Facility"). Pollutants from the Facility are picked up in stormwater and discharged via storm drains into the Merrimack River at a location mapped by the Commonwealth as core habitat for rare species, including the Bald Eagle. Agretech's stormwater discharge poses a long-term threat to aquatic ecosystems, the food chain, and human health.

2. Agretech has never applied for nor received a federal industrial stormwater discharge permit ("Stormwater Permit") for its stormwater discharges as required by the federal Clean Water Act. 33 U.S.C. §§ 1251-1387 (the "Clean Water Act" or the "Act"), and Agretech is not properly monitoring and controlling these discharges as required by the Act.

3. Agretech's discharges of stormwater to the Merrimack River are in violation of the Clean Water Act. The Commonwealth of Massachusetts brings this civil suit to enforce the requirements of the Act. The Commonwealth seeks injunctive relief, civil penalties, reasonable

costs including attorney fees, and other relief the Court deems appropriate to redress Agretech's illegal stormwater discharges.

**JURISDICTION AND VENUE**

4. This Court has jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United States).

5. On February 15, 2024, the Commonwealth provided notice of Agretech's violations of the Clean Water Act, and of its intention to file suit against Agretech (the "Notice Letter"), to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region 1; the Commissioner of the Massachusetts Department of Environmental Protection ("MassDEP"); and to Agretech, as required by the Act, 33 U.S.C. § 1365(b)(1)(A).

6. More than sixty days have passed since notice was served.

7. This action is not barred by any prior state or federal enforcement action addressing the violations alleged in this Complaint.

8. The Commonwealth has an interest in protecting for itself and its residents the integrity of the Massachusetts environment including its waters, and the related health, safety, economic, recreational, aesthetic, and environmental interests those waters provide. Polluted stormwater is the leading cause of water quality impairment in Massachusetts.

9. The Commonwealth has an interest in obtaining timely and accurate information concerning pollutant discharges into the Commonwealth's waters, as is required by the Act.

10. The interests of the Commonwealth have been, are being, and will continue to be adversely affected by Agretech's failure to comply with the Clean Water Act as alleged in this

Complaint. Agretech's violations threaten water quality in the Commonwealth and deprive the Commonwealth of essential information concerning water quality. Agretech's continuing acts and omissions, as alleged in this Complaint, will irreparably harm the Commonwealth, for which harm it has no plain, speedy, or adequate remedy at law. The requested relief will redress the harms to the Commonwealth caused by Agretech's activities.

11. Venue is proper in the District Court of Massachusetts pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

**PARTIES**

12. Plaintiff is the Commonwealth, appearing by and through the Attorney General.

13. The Attorney General is the chief law officer of the Commonwealth, with an office at One Ashburton Place, Boston, Massachusetts 02108. She is authorized to bring this action and to seek the requested relief under M.G.L. c. 12, §§ 3 and11D.

14. Agretech is a domestic profit corporation that lists its principal address as 100 Burtt Road, Suite G01, Andover, Massachusetts 01810.

**STATUTORY BACKGROUND**

**<u>Federal Clean Water Act Requirements</u>**

15. The Clean Water Act makes the discharge of pollutants into waters of the United States unlawful unless the discharge follows certain statutory requirements, including the requirement that the discharge be permitted by EPA under the National Pollutant Discharge Elimination System ("NPDES"). *See* Sections 301(a), 402(a) and 402(p) of the Act, 33 U.S.C. §§ 1311(a), 1342(a) and 1342(p).

16. During every rain or snowmelt event, runoff flows over the land surface, picking up potential pollutants such as sediment, organic matter, nutrients, metals, and petroleum by-products. Polluted stormwater runoff can be harmful to plants, animals, and people.

17. To minimize polluted stormwater discharges from industrial facilities, EPA has issued the general industrial Stormwater Permit under the NPDES program. EPA first issued the Stormwater Permit in 1995 and reissued the permit in 2000, 2008, 2015, and 2021. *See* 60 Fed. Reg. 50,804 (Sept. 29, 1995); 65 Fed. Reg. 64,746 (Oct. 30, 2000); 73 Fed. Reg. 56,572 (Sept. 29, 2008); 80 Fed. Reg. 34,403 (June 16, 2015); 86 Fed. Reg. 10,269 (Feb. 19, 2021). Citations herein are to the 2021 Stormwater Permit, which is the same for all relevant purposes as the 2015 version, except that the 2021 revision does not require scrap recycling and waste recycling facilities to monitor their stormwater for the presence of iron.

18. Owners and operators of scrap recycling and waste recycling facilities that discharge industrial stormwater to waters of the United States are subject to the requirements of the Stormwater Permit. Stormwater Permit, Appendix D, pg. D-4 (Sector N).

19. The Stormwater Permit requires Agretech to, among other things:

a) prepare a Stormwater Pollution Prevention Plan ("SWPPP") for the Facility that includes all of the elements required by the Stormwater Permit, Stormwater Permit, Sections 6, 8.N.4 (scrap recycling and waste recycling facilities);

b) submit to EPA a Notice of Intent ("NOI") for the Facility to be covered by the Stormwater Permit, Stormwater Permit, Section 1.3 and Appendix G;

c) select, design, install, and implement required pollutant control measures that minimize pollutants in stormwater discharges, Stormwater Permit, Sections 2, 8.N.3 (scrap recycling and waste recycling facilities);

d) collect and analyze stormwater samples and document monitoring procedures for monitoring requirements that apply to the Facility, Stormwater Permit, Section 4, including:

   i) benchmark monitoring for: chemical oxygen demand ("COD"), total suspended solids ("TSS"), total recoverable aluminum, total recoverable copper, total recoverable lead, and total recoverable zinc, Stormwater Permit, Section 8.N.7 (scrap recycling and waste recycling facilities);

e) report all monitoring data to EPA within mandatory deadlines, Stormwater Permit, Section 7.3;

f) conduct and document routine inspections and quarterly visual assessments of the Facility to, among other things, sample and assess the quality of the Facility's stormwater discharges, ensure that stormwater control measures required by the Stormwater Permit are functioning correctly and are adequate to minimize pollutant discharge, and ensure timely corrective actions are taken when they are not, Stormwater Permit, Sections 3.1 and 3.2;

g) comply with any additional inspection requirements applicable to scrap recycling and waste recycling facilities, Stormwater Permit, Section 8.N.5 (scrap recycling and waste recycling facilities);

h) conduct and document corrective action and additional implementation measures within mandatory timelines to expeditiously eliminate excessive

stormwater pollution whenever required by the Stormwater Permit, Stormwater Permit, Section 5; and

i) timely prepare and submit to EPA annual reports that include findings from the Facility inspections and visual assessments and the documentation of corrective actions and additional implementation measures, Stormwater Permit, Section 7.4.

**Citizen Suit Provision of the Clean Water Act**

20. Section 505(a)(1) of the Act authorizes citizen enforcement actions by any "person" against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements and for unpermitted discharges of pollutants. 33 U.S.C. §§ 1365(a)(1) and (f), 1362(5).

21. The Commonwealth is a "citizen" within the meaning of Section 505(g) of the Act, because it is a "person" having an interest which is or may be adversely affected by industrial stormwater pollution discharges. *See* 33 U.S.C. § 1365(g), 1362(5).

22. Under Section 505 of the Act, this Court has authority to enjoin Agretech's violations of the Act's prohibition on unauthorized discharges of pollutants and to require Agretech to comply with the Stormwater Permit. The Court also has authority to impose penalties of up to $68,445 per day for each of Agretech's prior violations. *See* 33 U.S.C. §§ 1365(a), 1319(d); 40 C.F.R. § 19.4; 90 Fed. Reg. 1,377 (Jan. 8, 2025).

## STATEMENT OF FACTS

### Description of the Facility and Agretech's Activities

23. Agretech performs a variety of scrap recycling and waste recycling activities at the Facility, including storage, processing, and sale of recycled aggregate construction materials ("Materials"), such as crushed recycled stone and gravel and washed concrete sand.

24. Agretech accepts Materials, which it separates into stockpiles at the Facility to be sold or processed. Material for processing is handled at the Facility by a series of on-site excavators and is crushed and/or screened to make various sizes using on-site crushing and screening machinery. Once processing is completed, the processed Materials are stockpiled at the Facility for sale.

25. As part of its scrap recycling and waste recycling activities, Agretech stores and warehouses uncovered Materials, trailers, tractors, dumpsters, vehicles, and other industrial equipment including loaders and excavators (collectively, "Industrial Equipment and Materials") outdoors at the Facility.

26. Agretech also owns a fleet of delivery trucks, which it uses to transport Materials to and from the Facility.

27. The Facility, which is at least 20 acres, is situated approximately 0.1 miles west of the Merrimack River across Merrimack Avenue. The Facility is accessed from Merrimack Avenue via Jackson Street.

28. The Facility is located approximately 0.35 miles upstream of a community that has been designated by the Commonwealth as an "Environmental Justice" population. Residents of such communities have the potential to be disproportionately impacted by environmental harms and risks.

**Agretech's Discharges of Pollutants from the Facility**

29. During every rain or snowmelt event, runoff flows over the Industrial Equipment and Materials and the surface at the Facility, picking up pollutants.

30. For at least five years, during rain events, Agretech has discharged polluted stormwater down Jackson Street, and via a ditch located several feet to the north of Jackson Street, into catch basins located at the end of Jackson Street where it intersects with Merrimack Avenue (the "Jackson Street Catch Basins"). The Jackson Street Catch Basins discharge into the Merrimack River.

31. The following figure, taken from Nearmap, has been annotated by the Attorney General's Office to depict the location of the Facility in relation to the Merrimack River. The figure also identifies the approximate locations of the Jackson Street Catch Basins and shows the direction of stormwater flow from the Facility to the Jackson Street Catch Basins.




32. The following aerial image, taken from Google Earth, has been annotated by the Attorney General's Office to depict the approximate locations of the Jackson Street Catch Basins and the direction of stormwater flow to the Jackson Street Catch Basins via Jackson Street and

the ditch along Jackson Street. The image, dated June 21, 2023, also shows water flowing from the Facility down Jackson Street to the Jackson Street Catch Basins.




33. The following street-view images, taken from Google Maps and annotated by the Attorney General's Office, also show water flowing down Jackson Street and into one of the Jackson Street Catch Basins. The first image was taken in November 2020, and the second image in August 2023.






34. The portion of the Merrimack River into which Agretech's stormwater discharges is mapped as BioMap Aquatic and Rare Species Core Habitat. The species of conservation for this Core Habitat are the Riverine Clubtail (*Stylurus amnicola*) and the Bald Eagle (*Aliaeetus leucocephaslus*).

**Potential Impacts from Pollutants in Agretech's Stormwater Discharges**

35. Stormwater discharged from scrap recycling and waste recycling facilities is likely to contain numerous pollutants associated with industrial activities. EPA requires scrap recycling and waste recycling facilities to conduct quarterly benchmark monitoring for COD and TSS as well as for the presence of total recoverable aluminum, total recoverable copper, total recoverable lead, and total recoverable zinc.

36. COD is a measurement of organic matter in water. Excessive discharges of organic matter pose a risk of harm to water quality and aquatic life. When high levels of organic matter are discharged to a waterbody, the presence of bacteria, fungi, and other decomposer organisms increases. The presence of decomposer organisms and the decomposition process lowers the available oxygen in the water, impairing other aquatic organisms or, in severe cases, asphyxiating them.

37. TSS is an indicator parameter that measures the presence of solids, or sediment, suspended in a water sample. Solids in scrap recycling stormwater discharges are likely to include non-dissolved metal particles and contaminated soil. Even uncontaminated sediment destroys habitat, harms aquatic organisms, and can contribute to flooding. Sediment settles to the bottom of a river where it disrupts and smothers bottom feeding organisms. Sediment becomes suspended in water, where it harms and kills fish by clogging their gills, making it harder for them to breathe. Excessive sedimentation harms the entire food chain by destroying habitat and killing the smaller organisms on which larger ones depend. For example, sediment in the water column increases turbidity, reducing light penetration, decreasing the ability of plant communities to photosynthesize, preventing animals from seeing food, and reducing fish populations. In addition, other pollutants, including toxic pollutants such as heavy metals, pesticides, and petroleum by-products, bind to sediment and can significantly impact water quality when carried by stormwater to rivers and other waterbodies.

38. Elevated levels of aluminum can affect some species' ability to regulate ions, like sodium and chloride, and can inhibit respiratory functions, like breathing. Aluminum can accumulate on the surface of a fish's gill, leading to respiratory dysfunction, and possibly death.

39. Copper, while an essential nutrient at low concentrations, is highly toxic to most aquatic species at higher concentrations. In addition to acute effects such as mortality, chronic exposure to copper can lead to adverse effects on survival, growth, and reproduction, as well as alterations of brain function, enzymatic activity, blood chemistry, and metabolism.

40. Lead and other heavy metals are picked up in stormwater and can adversely impact water quality. Lead also poses a significant threat to human health and safety. Adverse effects of lead in water on aquatic species occur at very low concentrations and include reduced

survival, impaired reproduction, and reduced growth. Even at low levels, lead may cause a range of human health effects, including learning disabilities, kidney problems, and high blood pressure. Children are particularly vulnerable to impacts from lead contamination.

41. Excess levels of zinc cause adverse effects to aquatic organisms, which are much more sensitive to zinc concentrations in water than humans are. At acutely toxic concentrations, it is thought that zinc kills fish by destroying gill tissues. At chronically toxic levels, zinc is thought to induce stress resulting in fish death. Excessive levels of zinc can alter soil and aquatic microbial diversity and can thus affect the bioavailability and absorption of other metals as well.

**Agretech's Failure to Comply with the Requirements of the Stormwater Permit**

42. Based on the scrap recycling and waste recycling activities that Agretech conducts at the Facility as set forth above, the Facility is subject to the requirements of the Stormwater Permit.

43. Agretech has not applied for or obtained a Stormwater Permit for its scrap recycling and waste recycling operations at the Facility.

44. Agretech has not complied with the terms of the Stormwater Permit. In particular, Agretech has failed to:

a) prepare a SWPPP for the Facility (violation of Stormwater Permit, Sections 6, 8.N.4);

b) submit an NOI for the Facility to EPA (violation of Stormwater Permit, Section 1.3 and Appendix G);

c) select, design, install, and implement required pollutant control measures that minimize pollutants in stormwater discharges (violation of Stormwater Permit, Sections 2, 8.N.3);

d) collect and analyze stormwater samples and document monitoring procedures for monitoring requirements as required (violation of Stormwater Permit, Section 4), including benchmark monitoring for: COD, TSS, total recoverable aluminum, total recoverable copper, total recoverable lead, and total recoverable zinc (violation of Stormwater Permit, Section 8.N.7);

e) report all monitoring data to EPA within mandatory deadlines (violation of Stormwater Permit, Section 7.3);

f) conduct and document routine Facility inspections and quarterly visual assessments to, among other things, sample and assess the quality of the Facility's stormwater discharges; ensure that stormwater control measures required by the Stormwater Permit are functioning correctly and are adequate to minimize pollutant discharge, and ensure timely corrective actions are taken when they are not (violation of Stormwater Permit, Sections 3.1 and 3.2);

g) comply with any additional inspection requirements applicable to scrap recycling and waste recycling facilities (violation of Stormwater Permit, Section 8.N.5);

h) conduct and document corrective action and additional implementation measures within mandatory timelines to expeditiously eliminate excessive stormwater pollution whenever required by the Stormwater Permit (violation of Stormwater Permit, Section 5); and

i) timely prepare and submit to EPA annual reports that include findings from the Facility inspections and visual assessments and the documentation of

corrective actions and additional implementation measures (violation of Stormwater Permit, Section 7.4).

**FIRST CAUSE OF ACTION**

**Discharges of Industrial Stormwater Without a Federal Stormwater Permit: Violations of Section 301(a) of the Federal Clean Water Act, 33 U.S.C. § 1311(a)**

45. The Commonwealth realleges and incorporates by reference the allegations contained in the above paragraphs.

46. Agretech is a "person" within the meaning of Section 502(5) of the Clean Water Act, 33 U.S.C. § 1362(5).

47. The Merrimack River is a "navigable water" within the meaning of Section 502(7) of the Clean Water Act, 33 U.S.C. § 1362(7).

48. By discharging industrial stormwater from the Facility without a Stormwater Permit into catch basins that discharge to the Merrimack River, Agretech has violated and continues to violate Section 301(a) of the Act, 33 U.S.C. § 1311(a).

49. Each day that Agretech discharged industrial stormwater from the Facility into the Merrimack River without a Stormwater Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a), for each day on which the violation occurred and/or continued. *See also* Sections 505(a)(1) and (f), 33 U.S.C. §§1365(a)(1) and (f).

50. These violations establish an ongoing pattern of failure to comply with the Act's requirements.

## SECOND CAUSE OF ACTION

### Noncompliance with the Federal Stormwater Permit: Violations of Section 301(a) of the Federal Clean Water Act, 33 U.S.C. § 1311(a)

51. The Commonwealth realleges and incorporates by reference the allegations contained in the above paragraphs.

52. Agretech has violated and continues to violate the Stormwater Permit by failing to implement its requirements, as set forth in paragraph 44, above.

53. Each of Agretech's violations of each of the requirements set forth in paragraph 44, above, is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a), for each day on which the violation occurred and/or continued. *See also* Sections 505(a)(1) and (f), 33 U.S.C. §§ 1365(a)(1) and (f).

54. These violations establish an ongoing pattern of violations of the Stormwater Permit's requirements.

## RELIEF REQUESTED

WHEREFORE, the Commonwealth respectfully requests that this Court grant the following relief:

1. Require Agretech to obtain and comply with EPA's federal Stormwater Permit and to cease operations until it has obtained and complied with the Stormwater Permit;

2. Order Agretech to pay civil penalties of up to $68,445 per day for each of its prior violations. *See* 33 U.S.C. §§ 1311(a); 1365(a); 1319(d); 40 C.F.R. § 19.4; 90 Fed. Reg. 1,377 (Jan. 8, 2025);

3. Order Agretech to take appropriate actions to restore the quality of waterways subjected to impairment from its unlawful activities;

4. Award the Commonwealth's costs (including reasonable investigative, attorney, witness, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and

5. Award any other and further relief as this Court may deem appropriate.

Dated: May 13, 2026

Respectfully submitted,

COMMONWEALTH OF MASSACHUSETTS

By its attorney,

ANDREA JOY CAMPBELL
ATTORNEY GENERAL

*/s/Michele Hunton*
Helen D. Yurchenco (Bar No. 712235)
Michele A. Hunton (Bar No. 667766)
Assistant Attorneys General
Environmental Protection Division
Office of the Attorney General
One Ashburton Place, 18th Floor
Boston, MA 02108
Tel: 617-963-2507
helen.yurchenco@mass.gov
michele.hunton@mass.gov